# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### February 11, 2020 Session

## CROUCH RAILWAY CONSULTING, LLC v. LS ENERGY FABRICATION, LLC

**Appeal by Permission from the Court of Appeals**
**Chancery Court for Williamson County**
**No. 45854    Joseph A. Woodruff, Judge**

_____

### No. M2017-02540-SC-R11-CV

_____

The issue in this appeal is whether a Tennessee court may exercise specific personal jurisdiction over a Texas corporate defendant involved in a contractual dispute with a Tennessee company it chose to perform specialized professional services. A Texas oil-drilling company elected to contract with a Tennessee civil engineering company for custom design and consulting services related to the potential construction of a railcar repair facility in Texas. The Tennessee company performed the services primarily out of its principal place of business in Tennessee. When the Texas company failed to pay in full, the Tennessee company filed a civil action in Tennessee for breach of contract and unjust enrichment. The Texas company moved to dismiss the complaint for lack of personal jurisdiction. See Tenn. R. Civ. P. 12.02(2). The Williamson County Chancery Court granted the motion, finding (1) that the Texas company lacked the "minimum contacts" necessary for the exercise of specific personal jurisdiction, and (2) that requiring the Texas company to litigate in Tennessee would be unreasonable and unfair. The Court of Appeals reversed, relying primarily on Nicholstone Book Bindery, Inc. v. Chelsea House Publishers, 621 S.W.2d 560 (Tenn. 1981), cert. denied, 455 U.S. 994 (1982). Although we find Nicholstone to be consistent with our opinion today, we base our review on contemporary jurisprudence in this area of the law. We hold that, consistent with the Due Process Clause of the Fourteenth Amendment, the Tennessee company established a prima facie case for the valid exercise of personal jurisdiction over the Texas company. Additionally, the exercise of jurisdiction would not be unfair or unreasonable. Therefore, we affirm the decision of the Court of Appeals and remand this case to the trial court for further proceedings.

**Tenn. R. App. P. 11 Appeal by Permission;**
**Judgment of the Court of Appeals Affirmed; Judgment of the Chancery Court**
**Reversed; Remanded to the Chancery Court**

JEFFREY S. BIVINS, C.J., delivered the opinion of the Court, in which CORNELIA A. CLARK, SHARON G. LEE, HOLLY KIRBY, and ROGER A. PAGE, JJ., joined.

Michael F. Rafferty and Emily Hamm Huseth, Memphis, Tennessee, and Benjamin D. West, Oxford, Mississippi, for the appellant, LS Energy Fabrication, LLC.

M. Clark Spoden and Payton M. Bradford, Nashville, Tennessee, for the appellee, Crouch Railway Consulting, LLC.

## OPINION

### I.      FACTUAL AND PROCEDURAL BACKGROUND

This case arises from a dispute between two companies from different states that entered into a contract for the provision of custom engineering services.[1]  The plaintiff, Crouch Railway Consulting, LLC ("Crouch"), is a Tennessee limited liability company with its principal place of business in Brentwood, Tennessee.  Crouch is a civil engineering firm that specializes in railway-related engineering services.  It has considerable expertise and has served clients nationwide.  The defendant, LS Energy Fabrication, LLC d/b/a Lonestar Energy Fabrication ("Lonestar"), is a Texas limited liability company with its principal place of business in Baytown, Texas.  Lonestar is in the business of fabricating oil field components, offshore rigs, and offshore quarters buildings.

On January 12, 2016, representatives from Crouch met with representatives from Lonestar in Baytown, Texas.  The record does not reveal exactly how this meeting came to occur, but it does reflect that Crouch approached Lonestar to make a business proposal. Lonestar was considering constructing a railcar repair facility in Texas.  This enterprise represented a new line of business for Lonestar, and the facility was to be designed to allow

---

[1] The trial court dismissed this case upon the defendant's motion under Tennessee Rule of Civil Procedure 12.02(2).  We therefore glean the facts from the plaintiff's complaint and the parties' affidavits and exhibits related to the motion to dismiss, accepting the plaintiff's allegations as true and resolving factual disputes in the plaintiff's favor.  State v. NV Sumatra Tobacco Trading Co., 403 S.W.3d 726, 739 (Tenn. 2013).

for growth of the business. Crouch proposed to provide preliminary planning and consulting services related to construction of the potential facility.

Returning to Tennessee after the January 12 meeting, Crouch prepared a twenty-one-page "Proposal for Preliminary Consulting and Planning" specific to Lonestar's objectives. Crouch emailed the proposal, signed in Tennessee by Senior Project Manager Scott Vick, to Lonestar on January 15, 2016. The proposal plainly displayed Crouch's Tennessee address, as did the cover letter that accompanied the proposal. In addition, the proposal explicitly stated that Crouch was located in Brentwood, Tennessee.[2] Crouch offered its professional services for a fixed fee of $55,450.00. Lonestar reviewed the proposal, and Brian Shanklin signed it on behalf of Lonestar in Texas. Terry Gazaw of Lonestar emailed the signature page to Crouch on January 22, 2016. The contract contained neither a forum selection clause nor a choice of law provision.

The contract called for Crouch to perform preliminary planning and engineering work to develop an overall facility plan, including a cost estimate and a timeline for completion of project design and construction. Under the contract, Crouch ultimately was to provide as a deliverable a preliminary engineering report detailing layouts for a shop and railroad infrastructure, as well as the railcar repair process and a design for a clean-in-place railcar wash system. Lonestar was obligated to pay a flat fee of $55,450.00 for the services.

The contract, however, did not leave Crouch entirely to its own devices. Instead, the contract expressly required Lonestar to designate a person with whom Crouch would communicate and anticipated continuing interaction between Crouch and Lonestar during the period of performance. For example, Lonestar was expected to play a role in developing a needs list for various aspects of the facility—shop offices, spare parts storage, valve shop, communications, break areas, locker facilities—and to be responsive to questions and clarifications sent via email. Likewise, Lonestar was expected to play a role with decisions for appropriate requirements for the scope of work regarding utilization of space, quality of construction, function of space, and type of equipment to be used. Additionally, Lonestar was expected to develop the scope and cost estimate for providing grading, construction, utilities, and telecommunications to the site, which details would be incorporated into Crouch's report.

The contract repeatedly indicated that Crouch would be working with Lonestar to complete performance. To that end, the contract referenced availability for three

---

[2] Crouch later provided Lonestar a W-9 form that also listed its Tennessee address.

consultation meetings—held through a remote platform that offered computer screen sharing—to discuss requirements for the facility and any questions. Over the course of work on the contract, Crouch anticipated providing a recommended facility layout, a revised layout based on Lonestar's input, and a final report. Crouch further anticipated adjusting the cost estimate with each iteration.

After the parties executed the contract, Crouch proceeded to perform the custom professional services called for, almost exclusively out of its office in Tennessee. For instance, Crouch:

1) completed preliminary planning and engineering to develop the facility plan for the proposed railcar repair operation;

2) confirmed the work process, identified the process equipment required, and ensured that the proposed facility was properly sized;

3) prepared a detailed layout of the feeder track, transfer tables, and clean-in-place wash system;

4) prepared a civil site drawing related to site grading, drainage, access roads, utilities, track layout, and new track construction;

5) prepared a detailed cost estimate for railroad design, complete repair process flow, railroad track work, rail construction, design and installation of the clean-in-place wash system, and process equipment; and

6) prepared a timeline for project design and construction completion.

Ultimately, on March 8, 2016, Crouch emailed Lonestar a fifty-two-page Preliminary Consulting and Planning Report. Like the contract, the report identified that it was prepared by Crouch and listed Crouch's address and telephone numbers in Tennessee. The proposed project was a significant one, with Crouch estimating that it would take nearly a year to complete, even utilizing a six-day work week, with a total project cost of nearly $14,000,000.00.

4

The only activities Crouch performed outside of Tennessee entailed four site visits to Texas, one each in January through April,[3] in furtherance of the design and consulting services provided under the contract. Representatives from Lonestar attended these visits, as did, on occasion, representatives from an interested third party. Aside from these site visits, both Crouch and Lonestar remained physically in their respective home states during the course of the contractual relationship.

Crouch and Lonestar, however, did communicate "multiple times via email … throughout the course of the work performed pursuant to the Agreement."[4] Lonestar's communications were, on occasion, substantive in nature. For instance, Crouch emailed Lonestar on January 29, 2016, a day after a site visit, to ask about dimensions for certain buildings on the site, and Lonestar replied specifying the dimensions so that Crouch could plan accordingly. Likewise, on February 25, 2016, Crouch and Lonestar traded emails about finalizing the choice of equipment inside the repair shop. The emails indicate that Crouch was waiting on "details related to the process flow/equipment desired by Lonestar" and that a Crouch subcontractor would be working with Lonestar on the issue. The issue was the subject of another email on February 29, 2016, again indicating that Lonestar was working with a Crouch subcontractor to finalize the decision.[5]

On March 8, 2016, just over six weeks after the parties had entered into the contract, Crouch emailed its Preliminary Consulting and Planning Report to Lonestar. The delivery of the report, however, did not mark the end of the relationship between Crouch and Lonestar.[6] The very day the report was delivered, Lonestar asked Crouch to participate in an upcoming site meeting with Lonestar and an interested third party, Trans-Global Solutions, Inc. ("TGS"). At this meeting, TGS proposed changes to the rail access. Thereafter, Lonestar and Crouch had further discussions about potential changes to the

---

[3] Two of the site visits—on March 9 and April 7, 2016—occurred after Crouch had delivered its Preliminary Consulting and Planning Report.

[4] In fact, immediately after sending the contract signature page to Crouch on January 22, 2016, Lonestar's Terry Gazaw specifically requested that Crouch "keep [him] in the loop on emails" about the project.

[5] According to the February progress report that Crouch provided Lonestar, Crouch received "confirmation of the necessary equipment to be provided with the repair shop" on March 1, 2016, and proceeded to finalize the report due under the contract.

[6] In the report itself, Crouch raised the possibility of serving as the project manager for construction of the facility. A section of the report specifically addressed Crouch's proposed construction management services. Crouch had indicated in its proposal to Lonestar that it would include these details.

shop layout and the process flow. By April 6, 2016, the "changes previously discussed" prompted Crouch to formally request a modification to the contract. The following week, on April 13, 2016, although there had been no modification to the contract, Crouch and Lonestar exchanged substantive communications on a number of project details.[7] Crouch emailed about a contract modification again, stating that it would require additional funding to proceed further.

Thereafter, communication between Crouch and Lonestar diminished. Crouch checked in with Lonestar via email on May 9, 2016, to which Lonestar replied that it hoped to have an update within the week. Crouch continued to check in with Lonestar via email over the course of the next month, going so far as to ask on June 7, 2016, whether the project had been cancelled, to which Lonestar replied that it was just "slow in development." By early July 2016, however, Crouch's emails revealed that it had heard Lonestar was reaching out to other companies. By October 2016, the writing was on the wall that the relationship between Crouch and Lonestar had come to an end. Crouch communicated, "In speaking with sources that are close to this project it is our understanding that Lonestar is proceeding with the project and using [Crouch's] provided documents as the basis for construction of the repair facility."

Crouch billed Lonestar on a monthly basis, sending Lonestar both an invoice and a progress report. For January 2016, Crouch's invoice requested payment of $16,635.00. Lonestar sent a check in that amount, dated February 22, 2016, to Crouch's Tennessee address. On March 6, 2016, Crouch emailed Lonestar the invoice for February 2016, requesting payment in the amount of $30,000.00. On April 5, 2016, Crouch emailed Lonestar the invoice for March 2016, requesting payment of the remaining amount due under the contract, $8,815.00. Crouch's repeated requests for payment of the February and March 2016 invoices went unanswered.

On January 13, 2017, Crouch filed suit in the Williamson County Chancery Court, alleging breach of contract and unjust enrichment. Lonestar moved to dismiss Crouch's complaint for lack of personal jurisdiction. See Tenn. R. Civ. P. 12.02(2). Lonestar argued that it lacked sufficient contacts with Tennessee to give rise to specific personal jurisdiction, such that the imposition of jurisdiction over Lonestar by a Tennessee court would offend traditional notions of fair play and substantial justice.

---

[7] Examples include discussion of an interior blast line, interior tank lining requirements, a nitrogen flush at the wash rack, reconfiguring building widths, and reconfiguring access to portions of the site.

In support of its motion, Lonestar submitted an affidavit and accompanying exhibits. Lonestar asserted, among other facts, that it was not registered to do business in Tennessee, that it had no registered agent in Tennessee, that it had never visited Tennessee for any business purpose related to the contract, that it had no property or operations in Tennessee, that it did not direct specific advertising to Tennessee, that it did not routinely sell anything to Tennessee customers, and that it did not routinely make purchases in Tennessee. Lonestar further asserted that it did not solicit Crouch in Tennessee, that the work performed under the contract was related to a facility that Lonestar proposed to build in Baytown, Texas, and that all in-person meetings associated with the contract took place in Texas.

Crouch responded in opposition to the motion and submitted competing affidavits and exhibits detailing the contractual relationship between the parties. Crouch asserted that Lonestar elected to commence a business relationship with Crouch, knowing that Crouch was a Tennessee company and would be performing work in Tennessee. Crouch further asserted that although Lonestar did not travel to Tennessee, Lonestar regularly communicated with Crouch in Tennessee and sent partial payment to Crouch in Tennessee. Thus, Crouch argued that Lonestar reasonably should have anticipated being haled into court in Tennessee when it failed to pay in full for Crouch's services.

The Williamson County Chancery Court granted Lonestar's motion to dismiss. In examining the issue, the trial court identified its jurisdictional inquiry as evaluating (1) whether Lonestar had sufficient minimum contacts with Tennessee connected to this cause of action, and (2) whether subjecting Lonestar to jurisdiction in Tennessee would violate traditional notions of fair play and substantial justice. Drawing from this Court's opinion in Gordon v. Greenview Hospital, Inc., 300 S.W.3d 635, 647 (Tenn. 2009), the trial court identified its analysis as focusing on "the quantity of [the defendant's] contacts [with the forum state], their nature and quality, and the relationship between the contacts and the cause of action." The trial court also recognized that, in evaluating whether the exercise of jurisdiction would comport with traditional notions of fair play and substantial justice, it must consider (1) the burden on the defendant, (2) the interests of the forum state, (3) the plaintiff's interest in obtaining relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy, and (5) the shared interest of the several states in furthering fundamental substantive social policies. See id. (citing Asahi Metal Indus. Co. v. Super. Ct., 480 U.S. 102, 113 (1987)).[8]

_____

[8] The trial court also drew, in part, from the opinion of this Court in Masada Inv. Corp. v. Allen, 697 S.W.2d 332 (Tenn. 1985). The structure of the due process analysis in Masada—a five-part combined test—differs somewhat from more contemporary expressions such as Gordon. We do not believe that the

7

The trial court recognized that Crouch's cause of action was based directly on the contract between Crouch and Lonestar. But the court viewed the extent of Lonestar's contacts with Tennessee as merely having signed a contract—in Texas—with a Tennessee company, communicated with that company by email, and sent a check to the company in Tennessee. Accordingly, the court found the quantity of Lonestar's contacts with Tennessee "to be trifling" and the nature and quality of the contacts "to be flimsy." The court recognized that Tennessee has an interest in adjudicating commercial disputes between its citizens and nonresidents, but it found that "it would be a burden and expensive to force Lonestar to litigate this dispute in Tennessee," and that "Texas has the most significant relationship to the litigation of this dispute." Thus, the court concluded that Lonestar had met its "burden of showing that exercising personal jurisdiction over it in Tennessee would be unreasonable and unfair."

Upon Crouch's appeal, the Court of Appeals reversed. Crouch Ry. Consulting, LLC v. LS Energy Fabrication, LLC, No. M2017-02540-COA-R3-CV, 2019 WL 1949631, at *11 (Tenn. Ct. App. Apr. 30, 2019), perm. app. granted (Tenn. Oct. 14, 2019). The Court of Appeals determined that:

> Lonestar purposefully targeted Tennessee when it entered into a business transaction with a Tennessee company for a customized, specialized service to be performed in Tennessee. And, because the cause of action stems directly from Lonestar's alleged breach of the contract—Lonestar's failure to pay the contract price—Lonestar's contacts with Tennessee are sufficient for specific personal jurisdiction in Tennessee.

Id. at *10. Thus, the Court of Appeals concluded that Crouch had carried the burden of establishing that Lonestar had the requisite minimum contacts for the exercise of personal jurisdiction in Tennessee.

The Court of Appeals went on to evaluate whether the exercise of jurisdiction over Lonestar was fair and reasonable based on (1) the burden on the defendant, (2) the interests of the forum state, (3) the plaintiff's interest in obtaining relief, (4) the judicial system's interest in obtaining the most efficient resolution of the controversy, and (5) the interests

difference is qualitatively significant or that it reflects an erroneous statement of law by the trial court. We, however, have explained that in light of the development of the two-part test described in Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476-77 (1985), "[i]nvoking the five-part Masada test is no longer necessary." Sumatra, 403 S.W.3d at 751.

8

of the shared states in furthering substantive social policies.  Id. at *11.  The court concluded that the burden on Lonestar would not be so substantial as to achieve constitutional magnitude, whereas Crouch's and the State's interests were substantial.  The court also recognized that witnesses might be located in both Tennessee and Texas, and litigating in Tennessee would be no less efficient than in Texas.  Accordingly, the Court of Appeals held that Lonestar had not carried its burden of demonstrating that the exercise of jurisdiction in Tennessee would be unreasonable or unfair.  Id.

The Court of Appeals conducted a detailed analysis of the jurisdictional issue, examining both federal and Tennessee precedent.  Chief among that precedent in the context of this case was a nearly forty-year-old opinion from this Court, Nicholstone Book Bindery, Inc. v. Chelsea House Publishers, 621 S.W.2d 560 (Tenn. 1981), cert. denied, 455 U.S. 994 (1982).  We granted Lonestar's application for permission to appeal to examine the issue of specific personal jurisdiction in this case in light of the developments in this nuanced area of the law since our decision in Nicholstone.

## II.    ANALYSIS

To enter a valid judgment, a court must have jurisdiction over the person of the defendant.  See, e.g., Kulko v. Super. Ct., 436 U.S. 84, 91 (1978).  Because a state court's assertion of jurisdiction exposes a defendant to the state's coercive power, it is subject to review for compatibility with the protections of the Due Process Clause of the Fourteenth Amendment.[9]  Bristol-Myers Squibb Co. v. Super. Ct., 137 S.Ct. 1773, 1779 (2017).  The Due Process Clause "limits the power of a state court to render a valid personal judgment against a nonresident defendant."  World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291 (1980).  Under the Due Process Clause, the existence of personal jurisdiction over a nonresident defendant "depends upon the presence of reasonable notice to the defendant that an action has been brought[] and a sufficient connection between the defendant and the forum State to make it fair to require defense of the action in the forum."  Kulko, 436 U.S. at 91 (citation omitted).

Whether Lonestar received reasonable notice of Crouch's action is not at issue in this appeal.  Rather, Lonestar argues that its connection with Tennessee is so minimal that

---

[9] In the context of specific personal jurisdiction, "we have interpreted the due process protections of the Tennessee Constitution as being co-extensive with those of the United States Constitution."  Sumatra, 403 S.W.3d at 741.  Thus, our analysis in this case ultimately focuses on the Fourteenth Amendment to the United States Constitution.

9

due process guarantees preclude the exercise of personal jurisdiction by the trial court in this case.

## *A.     Standard of Review*

A defendant may challenge the existence of personal jurisdiction by filing a motion to dismiss the complaint under Rule 12.02(2) of the Tennessee Rules of Civil Procedure. The defendant may choose to support the motion with affidavits or other evidentiary materials. If a defendant does so, the plaintiff must respond with its own affidavits or other evidentiary materials. First Cmty. Bank, N.A. v. First Tenn. Bank, N.A., 489 S.W.3d 369, 382 (Tenn. 2015); Gordon, 300 S.W.3d at 644. However, a Rule 12.02(2) motion is not converted to one for summary judgment when the parties submit matters outside the pleadings. State v. NV Sumatra Tobacco Trading Co., 403 S.W.3d 726, 739 (Tenn. 2013); Gordon, 300 S.W.3d at 644.

The plaintiff bears the burden—albeit not a heavy one—of establishing that the trial court may properly exercise personal jurisdiction over a defendant. First Cmty. Bank, 489 S.W.3d at 382; Gordon, 300 S.W.3d at 643. When a defendant supports its Rule 12.02(2) motion with affidavits or other evidentiary materials, the burden is on the plaintiff to make a prima facie showing of personal jurisdiction over the defendant through its complaint and affidavits or other evidentiary materials. To make a prima facie showing of personal jurisdiction under Tennessee law, the factual allegations in the plaintiff's complaint, affidavits, and other evidentiary materials must establish sufficient contacts between the defendant and Tennessee with reasonable particularity. First Cmty. Bank, 489 S.W.3d at 383.

In evaluating whether the plaintiff has made a prima facie showing, the trial court must accept as true the allegations in the plaintiff's complaint and supporting papers and must resolve all factual disputes in the plaintiff's favor. Sumatra, 403 S.W.3d at 739. However, the court is not obligated to accept as true allegations that are controverted by more reliable evidence and plainly lack credibility, conclusory allegations, or farfetched inferences. First Cmty. Bank, 489 S.W.3d at 382. Nevertheless, the court should proceed carefully and cautiously to avoid improperly depriving the plaintiff of its right to have its claim adjudicated on the merits. Gordon, 300 S.W.3d at 644.

A trial court's decision regarding the validity of personal jurisdiction over a defendant presents a question of law. We therefore conduct a de novo review of the trial court's decision with no presumption of correctness. First Cmty. Bank, 489 S.W.3d at 382; Gordon, 300 S.W.3d at 645. In other words, in this appeal, we conduct the same evaluation

10

of Crouch's complaint and the parties' affidavits and supporting papers relating to Lonestar's Rule 12.02(2) motion as the trial court.

## B.  Specific Personal Jurisdiction

The authority of a Tennessee court to exercise personal jurisdiction over a nonresident defendant is first defined by statute.  See generally Sumatra, 403 S.W.3d at 740-41 (discussing the history of Tennessee's long-arm statutes); Gordon, 300 S.W.3d at 645-46 (same).  Tennessee law provides, in part, that a nonresident is subject to the jurisdiction of a Tennessee court not only as to any action or claim for relief that arose from "[e]ntering into a contract for services to be rendered … in this state," but also on "[a]ny basis not inconsistent with the constitution of this state or of the United States."  Tenn. Code Ann. § 20-2-214(a)(5), (6) (2009); see also Tenn. Code Ann. § 20-2-225(2) (2009).  We have recognized that Tennessee's long-arm statutes expand the jurisdictional reach of Tennessee courts "as far as constitutionally permissible."[10] First Cmty. Bank, 489 S.W.3d at 384 (quoting Sumatra, 403 S.W.3d at 740).  The constitutional limits of that jurisdiction are "set by the Due Process Clause of the Fourteenth Amendment to the United States Constitution."  Sumatra, 403 S.W.3d at 741.  As we analyze those limits, we observe that although the decisions of the federal circuit and district courts—and even those of our sister states—can be instructive as we interpret the application of the Fourteenth Amendment in the context of this case, we are bound only by the decisions of the United States Supreme Court.  See Hughes v. Tenn. Bd. of Prob. & Parole, 514 S.W.3d 707, 713 n.8 (Tenn. 2017); State v. Carruthers, 35 S.W.3d 516, 561 n.45 (Tenn. 2000).

The principle that the Due Process Clause of the Fourteenth Amendment limits the authority of state courts to enter binding judgments against nonresident defendants dates back to the nineteenth century.  McGee v. Int'l Life Ins. Co., 355 U.S. 220, 222 (1957) (identifying due process limits announced in Pennoyer v. Neff, 95 U.S. 714 (1877)).  The United States Supreme Court first articulated the modern approach for analyzing due process limitations on personal jurisdiction in the transformative case of International Shoe Co. v. Washington, 326 U.S. 310 (1945).  The Court eschewed the historical view that a defendant's presence within the territorial jurisdiction of a court is a prerequisite to the court's authority to render a valid judgment.  Id. at 316 (citing Pennoyer, 95 U.S. at 733).  In its place, the Court crafted a new view:

---

[10] Because Tennessee's long-arm statutes reach as far as constitutionally permissible, the question of how the allegations in the plaintiff's complaint fit within the long-arm statutes is effectively subsumed in the question of whether it is constitutionally permissible for a Tennessee court to exercise jurisdiction over the nonresident defendant.

11

> [D]ue process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."

Id. (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)). International Shoe's "minimum contacts" paradigm has been the touchstone of personal jurisdiction for seventy-five years.

From the very beginning, the Court stated that the analysis "cannot be simply mechanical or quantitative." Id. at 319. Instead, "[w]hether due process is satisfied must depend rather upon the quality and nature" of the defendant's activities. Id. Thus, in the wake of International Shoe, the relationship among the defendant, the forum, and the litigation became the central concern of the inquiry into personal jurisdiction. Daimler AG v. Bauman, 571 U.S. 117, 126 (2014).[11]

In the ensuing years, the Court refined the analysis. The contemporary view—first announced in the 1980s—entails a two-step process for evaluating questions of specific personal jurisdiction. A court first should consider whether a defendant has sufficient judicially cognizable ties with the forum state, as a state court may exercise jurisdiction over a nonresident defendant only so long as there exist minimum contacts between the defendant and the forum state. If minimum contacts exist, the court should then determine whether, even with the requisite minimum contacts, the exercise of jurisdiction would nonetheless be unfair or unreasonable. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475-76 (1985); Rush v. Savchuk, 444 U.S. 320, 332 (1980); World-Wide Volkswagen, 444 U.S. at 291-92.

As to the question of the existence of minimum contacts, the Court has stated that contacts are sufficiently meaningful when they demonstrate that the defendant has

---

[11] International Shoe also "presaged the development of two categories of personal jurisdiction," now commonly known as general jurisdiction and specific jurisdiction. Daimler, 571 U.S. at 126. When a defendant's affiliations with a forum state are so continuous and systematic as to render it essentially at home there, a court may exercise jurisdiction as to any claim against that defendant, even if the incidents underlying the claim occurred in a different state. This category is referred to as general jurisdiction. In contrast, for a court to exercise specific jurisdiction, the suit must arise out of or relate to the defendant's contacts with the forum state. Bristol-Myers Squibb, 137 S.Ct. at 1780; Daimler, 571 U.S. at 127. In this case, we address only specific personal jurisdiction, as Crouch does not contend that Lonestar would be subject to general jurisdiction in Tennessee. Additionally, there is no question in this case that Crouch's claims arise out of or relate to Lonestar's contacts with Tennessee.

purposefully directed activities at or availed itself of the forum state in such a way that the defendant should reasonably anticipate being haled into court there. Burger King, 471 U.S. at 472-74. This "'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person.'" Id. at 475 (citations omitted).

As to the question of whether, if sufficient minimum contacts between the defendant and the forum state exist, the exercise of jurisdiction would nonetheless be unfair or unreasonable, the Court has identified several factors to consider: (1) the burden on the defendant, (2) the interests of the forum state, (3) the plaintiff's interest in obtaining relief, (4) the judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interests of the several states in furthering fundamental substantive social policies. Id. at 476-77 (citing World-Wide Volkswagen, 444 U.S. at 292). However, given the existence of minimum contacts, a defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." Id. at 477.

Personal jurisdiction jurisprudence in Tennessee has "generally hewn closely to the United States Supreme Court's precedents." Sumatra, 403 S.W.3d at 751. For instance, this Court long ago recognized the "purposeful availment" requirement as part of the minimum contacts paradigm. Darby v. Superior Supply Co., 458 S.W.2d 423, 425 (Tenn. 1970) (citing Hanson v. Denckla, 357 U.S. 235, 253 (1958)). And we have recognized that contacts—purposefully directed—are constitutionally sufficient when "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." Masada Inv. Corp. v. Allen, 697 S.W.2d 332, 334 (Tenn. 1985) (quoting World-Wide Volkswagen, 444 U.S. at 297).

We have refined the analysis over time, following the lead of the United States Supreme Court, culminating in our contemporary approach to questions of specific personal jurisdiction. As we recently synthesized:

> Determining whether a forum state may exercise specific personal jurisdiction over a nonresident defendant is a two-step analysis which requires a court to analyze first whether the defendant's activities in the state that gave rise to the cause of action constitute sufficient minimum contacts with the forum state to support specific jurisdiction and, if so, whether the exercise of jurisdiction over the nonresident defendant is fair.

First Cmty. Bank, 489 S.W.3d at 388.

13

As to the question of minimum contacts, we have recognized that a nonresident defendant's contacts "must arise out of the defendant's own purposeful, deliberate actions directed toward the forum state," id. at 389 (citing Burger King, 471 U.S. at 472-73, 475-76), and be substantial enough to give rise to jurisdiction, id. (citing Walden v. Fiore, 571 U.S. 277, 284 (2014); Burger King, 471 U.S. at 475). In evaluating whether the defendant's contacts are substantial enough to give rise to jurisdiction, we consider "the quantity of the contacts, their nature and quality, and the source and connection of the cause of action with those contacts," id. (quoting Sumatra, 403 S.W.3d at 759-60), to determine whether the contacts demonstrate that the defendant has purposefully targeted Tennessee to the extent that the defendant should reasonably anticipate being haled into court here, id. at 389-90.

As to the question of whether the exercise of jurisdiction would be unreasonable or unfair even with the existence of minimum contacts, we have observed that the determination involves a judgment concerning "the quality and nature of the defendant's contacts with the forum and the fair and orderly administration of the law." Sumatra, 403 S.W.3d at 751-52 (quoting Davis Kidd Booksellers, Inc. v. Day-Impex, Ltd., 832 S.W.2d 572, 575 (Tenn. Ct. App. 1992)). The court's judgment should be informed by considering: (1) the burden on the defendant; (2) the interests of the forum state; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies. Id. at 752 (citing Davis Kidd Booksellers, 832 S.W.2d at 575); Gordon, 300 S.W.3d at 647 (citing Asahi, 480 U.S. at 113).

## C.    Personal Jurisdiction in Contract Cases

We recognize that applying the aforementioned precepts in an individual case is on occasion a far more difficult task than setting them out on paper. For instance, even the United States Supreme Court has acknowledged that "[t]he conclusion that the authority to subject a defendant to judgment depends on purposeful availment . . . does not by itself resolve many difficult questions of jurisdiction that will arise in particular cases." J. McIntyre Mach., Ltd. v. Nicastro, 564 U.S. 873, 885 (2011). Indeed, the Court has explicitly recognized that when analyzing the validity of the exercise of personal jurisdiction, "few answers will be written 'in black and white. The greys are dominant and even among them the shades are innumerable.'" Kulko, 436 U.S. at 92 (quoting Estin v. Estin, 334 U.S. 541, 545 (1948)).

14

Moreover, in contract cases in particular, the validity of the exercise of personal jurisdiction over a nonresident defendant has often fit squarely within the grey area. See, e.g., Mountaire Feeds, Inc. v. Agro Impex, S.A., 677 F.2d 651, 655 (8th Cir. 1982) ("Application of International Shoe to . . . cases involving contract claims by resident plaintiffs against nonresident corporate defendants . . . has produced somewhat inconsistent results."); see also Mark. J. Gentile, Note, Long-Arm Jurisdiction in Commercial Litigation: When Is a Contract a Contact, 61 B.U. L. Rev. 375, 401 (1981) ("Determining which activities constitute purposeful connection with a forum has proven a difficult task. The problem is highlighted in cases involving single-contract contacts."). This circumstance did not go unnoticed by the United States Supreme Court.

In Lakeside Bridge & Steel Co. v. Mountain State Construction Co., 597 F.2d 596 (7th Cir. 1979), cert. denied, 445 U.S. 907 (1980), the Seventh Circuit Court of Appeals addressed a question of the validity of personal jurisdiction in a contract case. The West Virginia defendant had a contract to construct the outlet works for a dam project in Virginia. The Wisconsin plaintiff visited the defendant's office in West Virginia to solicit a subcontract to supply structural assemblies for the outlet works. The defendant ultimately accepted the proposal and mailed a purchase order to the plaintiff in Wisconsin. Lakeside Bridge, 597 F.2d at 598.

The contacts between the plaintiff and the defendant all occurred outside Wisconsin or by mail or telephone. During the subcontract negotiation process "and presumably afterward," there were telephone conversations and mail correspondence between the parties. Id. However, the defendant had "no place of business, property, bank deposits, telephone, or telephone listing in Wisconsin and ha[d] never sent any officer, agent, or employee to that state; nor ha[d] it had any other kind of contact with Wisconsin except for the events that gave rise to this action." Id. at 597.

The plaintiff manufactured the structural assemblies in Wisconsin and shipped them to the project site in Virginia. The defendant found the goods to be defective in certain respects and withheld a portion of the payment due for the goods. The plaintiff sued for breach of contract in Wisconsin. Id. at 598.

The Seventh Circuit Court of Appeals held that Wisconsin lacked specific personal jurisdiction over the defendant. Id. at 597. In evaluating whether the defendant had minimum contacts with Wisconsin, the court looked to the contract and the communications between the parties during contract negotiation and performance. Id. at 600. The court determined that the defendant had not purposefully availed itself of the privilege of conducting activities in Wisconsin. Instead, the court found that the

15

jurisdictional basis was the "performance of contractual obligations by the plaintiff, not the defendant, in the forum state." Id. at 601. The court considered this basis to be the result of the "unilateral activity" of the plaintiff rather than attributable to the defendant. Id. at 600-01, 603 (quoting Hanson, 357 U.S. at 253). The court viewed as very significant that the plaintiff was in absolute control over where to conduct the activity to fulfill the contract, even though the defendant may have believed the plaintiff would do so in Wisconsin. Id. at 603.

The plaintiff sought review in the United States Supreme Court. The Court denied certiorari, but Justice White, with Justice Powell joining, dissented from the denial. Lakeside Bridge & Steel Co. v. Mountain State Constr. Co., 445 U.S. 907 (1980) (White, J., dissenting from denial of certiorari). The dissent stated that "the question of personal jurisdiction over a nonresident corporate defendant based on contractual dealings with a resident plaintiff has deeply divided the federal and state courts."[12] Id. at 909.

The situation had not changed two years later when the Court denied certiorari in Nicholstone, a case in which, as discussed more fully below, we found jurisdiction in Tennessee over a nonresident corporate defendant in a contractual dispute with a Tennessee corporation. Justice White, joined by Chief Justice Burger and Justice Powell, dissented from the denial of certiorari and stated that "the disarray among federal and state courts noted in Lakeside has continued." Chelsea House Publishers v. Nicholstone Book Bindery, Inc., 455 U.S. 994 (1982) (White, J., dissenting from denial of certiorari).

Three years later, in 1985, the United States Supreme Court issued its opinion in Burger King, at the time its first case to address personal jurisdiction in a contract context in nearly thirty years. See McGee, 355 U.S. 220. Burger King remains the most significant pronouncement on personal jurisdiction in a contract case to this day.

In Burger King, two Michigan residents applied to operate a Burger King franchise in Michigan. The residents applied with Burger King's Michigan district office. The application was forwarded to Burger King's Florida headquarters, which reached a preliminary agreement with the residents in February 1979. Burger King, 471 U.S. at 466.

---

[12] Indeed, the Seventh Circuit Court of Appeals acknowledged in Lakeside Bridge the existence of potentially contrary precedent, including from the Wisconsin Supreme Court. 597 F.2d at 599 (citing Zerbel v. H. L. Federman & Co., 179 N.W.2d 872 (Wis. 1970) (finding personal jurisdiction in Wisconsin over a nonresident corporate defendant where the defendant contracted for financial investment evaluation services that the defendant knew would be performed in Wisconsin)). As for the Zerbel decision, the Seventh Circuit Court of Appeals distinguished it on several grounds, including that the contract there was for services rather than goods. Lakeside Bridge, 597 F.2d at 599.

16

The residents continued to negotiate remotely—primarily with the Florida headquarters—and the parties ultimately signed the final franchise agreement in June 1979. Id. at 467.

Under the franchise agreement, Burger King licensed the residents to use its trademarks for a period of twenty years. Burger King also provided the residents a variety of proprietary information and other assistance, including training in restaurant management, to allow them to more effectively enter the restaurant business. The residents purchased $165,000.00 worth of equipment from a Burger King division in Florida, and one of the residents attended prescribed restaurant management training in Miami. The residents agreed to send regular payments to Burger King in Florida and to allow oversight of their operation by Burger King's Florida headquarters and Michigan district office. Id. at 466-67.

The residents' business took a turn for the worse later in 1979 with the arrival of a recession. The residents fell behind in the monthly payments owed to Burger King in Florida. Negotiations by mail and telephone occurred between the residents and Burger King—both its Florida headquarters and its Michigan district office—but the parties were unable to resolve the matter. In May 1981, Burger King filed suit in Florida for breach of the franchise agreement and tortious interference with its trademarks through the continued unauthorized operation of the Michigan restaurant. The residents challenged whether jurisdiction was constitutionally permissible in Florida. Id. at 468-69.

In Burger King, the Court synthesized the two-part jurisdictional inquiry discussed above. Id. at 474-77. But the Court also offered guidance specific to the contract context, noting "a continued division among lower courts." Id. at 478. The Court clarified that a contract can indeed form the basis for minimum contacts sufficient to allow for the exercise of personal jurisdiction over a nonresident defendant. Id. at 478-81; see also McGee, 355 U.S. at 223 ("It is sufficient for purposes of due process that the suit was based on a contract which had substantial connection with that State."); Travelers Health Ass'n v. Virginia ex rel. State Corp. Comm'n, 339 U.S. 643, 647 (1950) (finding jurisdiction "where business activities reach out beyond one state and create continuing relationships and obligations with citizens of another state"). However, the Court emphasized that the mere existence of the contract does not establish sufficient minimum contacts. Burger King, 471 U.S. at 478.

Thus, a court must dig deeper in the context of a contract case, for business transactions ordinarily "neither begin nor end with the contract." Hoopeston Canning Co. v. Cullen, 318 U.S. 313, 318 (1943). Instead, the contract is "but an intermediate step serving to tie up prior business negotiations with future consequences which themselves

17

are the real object of the business transaction." Burger King, 471 U.S. at 479 (quoting Hoopeston Canning, 318 U.S. at 317). Accordingly, in a contract case, the court must examine the "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" to determine whether a nonresident defendant purposefully established minimum contacts in the forum state. Burger King, 471 U.S. at 479.

Examining the business transaction involved in Burger King, the Court duly recognized the defendant's lack of physical ties to Florida.[13] But the Court found it significant that the defendant "reached out beyond" Michigan to negotiate and contract with a Florida corporation, id. at 479-80 (citing Travelers Health Ass'n, 339 U.S. at 647), and the "dispute grew directly out of a contract which had a substantial connection with [Florida]," id. at 479 (internal quotation omitted). The Court also emphasized that the defendant "most certainly knew he was affiliating himself with an enterprise based primarily in Florida." Id. at 480. Additionally, the Court explained that the contract called for "a carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts with Burger King in Florida." Id. Obviously, the parties' actual course of dealing did not last that long—only two years, in fact—but the Court noted "a continuous course of direct communication by mail and by telephone" between the defendant and the Florida headquarters. Id. at 481. Lastly, the Court found the existence of a Florida choice-of-law provision in the contract worthy of consideration, in that "it reinforced [the defendant's] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there." Id. at 482.

Based on these circumstances, the Court determined that the defendant purposefully availed himself of the privilege of conducting business activities in Florida. Id. at 476, 482. The Court further determined that the defendant "established a substantial and continuing relationship with Burger King's [Florida] headquarters [and] received fair notice from the contract documents and the course of dealing that he might be subject to suit in Florida." Id. at 487. Accordingly, the Court held that jurisdiction in Florida was permissible. Id.

---

[13] Only one of the two Michigan residents was a defendant before the Court. The other resident did not appeal. Burger King, 471 U.S. at 469 n.11. The non-appealing resident was the individual who attended restaurant management training in Miami. The Court found it unnecessary to resolve whether the non-appealing resident's visit to Miami could be attributed to the defendant for purposes of the minimum contacts analysis. Id. at 479 n.22.

18

In spite of the guidance from Burger King, the issue of personal jurisdiction in a contract case remained a grey area. In the words of Judge Learned Hand, the guidance only helps a court to "put the question to be answered." Hutchinson v. Chase & Gilbert, 45 F.2d 139, 141 (2d Cir. 1930). Answering the question can remain challenging in certain circumstances. "The difficult cases are those in which a nonresident commercial buyer places a single order with a local seller." Martin B. Louis, Jurisdiction Over Those Who Breach Their Contracts: The Lessons of Burger King, 72 N.C. L. Rev. 55, 82 (1993). Such is essentially the case before us now.

### D. Lonestar's Minimum Contacts

In determining whether Crouch has made out a prima facie case showing Lonestar's sufficient minimum contacts with Tennessee related to this action, we examine whether Lonestar's contacts were purposeful and substantial enough to merit the exercise of personal jurisdiction. See Burger King, 471 U.S. at 475 ("Jurisdiction is proper . . . where the contacts proximately result from actions by the defendant himself that create a 'substantial connection' with the forum state." (quoting McGee, 355 U.S. at 223)); First Cmty. Bank, 489 S.W.3d at 389 ("The defendant's connection with the forum state must be not only intentional, but also 'substantial' enough to give rise to jurisdiction."). As to the former, there must be some act or acts by which Lonestar purposefully availed itself of the privilege of conducting activities within Tennessee, or stated another way, deliberately engaged in activities directed at Tennessee. Burger King, 471 U.S. at 475-476. The requirement thus ensures that Lonestar is not called to answer in Tennessee based on the unilateral activity of another party or third party, or solely as a result of random, fortuitous, or attenuated contacts. Id. at 475.

We acknowledge that Lonestar representatives never physically visited Tennessee in relation to the contract with Crouch. But, of course, the notion that a defendant, in an appropriate case, may be subject to personal jurisdiction without physically having entered the forum is by now "an unexceptional proposition." Nicastro, 564 U.S. at 882; see also Burger King, 471 U.S. at 476 ("So long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there."); Masada, 697 S.W.2d at 334 (stating that a defendant's contacts with the forum state need not be physical).

The record reveals that Lonestar elected to enter into a contract with Crouch, knowing that Crouch was a Tennessee company. Lonestar sought custom professional services from Crouch, understanding that Crouch's office was located in Tennessee and,

19

thus, the services would primarily occur in Tennessee. Lonestar emailed the executed contract to Crouch in Tennessee. Lonestar also—in conformance with the expectations set forth in the contract—continued to communicate with Crouch in Tennessee by telephone and email during the course of the contractual relationship, including at least some substantive communications to aid accomplishing performance of the contract. Lastly, Lonestar sent partial payment in the form of a check by mail to Tennessee, where Crouch deposited it into a bank.

Lonestar points out that it was Crouch that approached Lonestar about a business relationship and physically visited Lonestar at its office in Texas. Although caselaw indicates that this is a factor to consider, we find that this factor is not determinative. Indeed, we find more significant—from the perspective of evaluating whether Lonestar's contacts with Tennessee were purposeful—that Lonestar eventually chose to contract with Crouch, a company with considerable experience and expertise in railway engineering. See Nationwide Mut. Ins. Co. v. Tryg Int'l Ins. Co., 91 F.3d 790, 796 (6th Cir. 1996) (citing Southern Mach. Co. v. Mohasco Indus., Inc., 401 F.2d 374, 382 (6th Cir. 1968)) (stating that whether the defendant ultimately chose to deal with the plaintiff was more significant than whether plaintiff or defendant initiated the contact between the parties); Hough v. Leonard, 867 P.2d 438, 444 (Okla. 1993) (stating that regardless of who initiated contact, the nonresident defendant could have refused to enter into the contract and thereby alleviated the risk of defending suit in the forum state). Lonestar certainly could have declined to do business with a Tennessee company. Ultimately, however, Lonestar voluntarily chose to take advantage of a business opportunity in Tennessee.

Additionally, the fact that Lonestar's contacts—at the time of contracting and throughout the parties' course of dealing—occurred through emails, telephone calls, and mailings does not detract from their purposeful direction to Tennessee. The transmission of information into a forum by way of email, telephone, or mail is unquestionably a contact for purposes of personal jurisdiction analysis. See Sawtelle v. Farrell, 70 F.3d 1381, 1389-90 (1st Cir. 1995) (citing Burger King, 471 U.S. at 476); Grand Entm't Grp., Ltd. v. Star Media Sales, Inc., 988 F.2d 476, 482 (3d Cir. 1993); see also Walden, 571 U.S. at 285 ("[P]hysical entry into the State—either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact."); Diamond Grp., Inc. v. Selective Distribution Int'l, Inc., 998 N.E.2d 1018, 1024 (Mass. App. Ct. 2013) (recognizing that the use of the telephone and the mail renders actual physical presence unnecessary). Moreover, there was nothing random about Lonestar's sending communications to Tennessee. Rather, Lonestar did so directly in furtherance of its business opportunity in Tennessee. See McMahan Jets, LLC v. Roadlink Transp., Inc.,

20

926 F. Supp. 2d 999, 1004 (W.D. Tenn. 2013) (recognizing that a nonresident defendant's "acts in executing its own promises under [a] contract are not random or attenuated").

After evaluating Lonestar's contacts with Tennessee related to the contract that forms the basis for Crouch's suit, we conclude that the circumstances do exhibit intentional or purposeful acts on the part of Lonestar. The purposeful availment requirement, in part, is designed to ensure that a defendant is called to answer in a forum based on its own deliberate acts, not the unilateral activity of another party or third party, nor solely as a result of random, fortuitous, or attenuated contacts. Burger King, 471 U.S. at 475. In this case, Lonestar itself chose the path that led to its Tennessee contacts, and we find nothing random, fortuitous, or attenuated about the contacts.

Having concluded that Lonestar's contacts with Tennessee were deliberate, we now consider the more difficult question of whether those contacts were substantial enough to allow for the exercise of personal jurisdiction. Lonestar's contacts are substantial enough if they reflect that Lonestar's conduct and connection to Tennessee are such that it should reasonably anticipate being haled into a Tennessee court. See Burger King, 471 U.S. at 474.

This case arises from a single contract. We note that a single contract can entail sufficiently meaningful contacts to allow for the exercise of personal jurisdiction. See, e.g., Humphreys v. Selvey, 154 S.W.3d 544, 552 (Tenn. Ct. App. 2004) (citing Neal v. Janssen, 270 F.3d 328, 331 (6th Cir. 2001)) (stating that even a single contract can support a finding of minimum contacts); William W. Bond, Jr. & Assocs., Inc. v. Montego Bay Dev. Corp., 405 F. Supp. 256, 260 (W.D. Tenn. 1975) (stating that a "one-shot contract, if substantial enough" could amount to sufficient minimum contacts). However, we further recognize that we must carefully examine the breadth and depth of the contractual relationship. The fact that this case arose from a single contract serves to illustrate that Lonestar's contacts with Tennessee were somewhat limited.

The record reflects that Crouch emailed a proposal to Lonestar on January 15, 2016. One week later, Lonestar had signed the proposal and emailed the contract back to Tennessee. Lonestar did not reach out to Tennessee to negotiate the terms of the contract with Crouch. Crouch produced its preliminary report on March 8, 2016, just over six weeks after execution of the contract. Although Crouch and Lonestar communicated "multiple times" over that six-week time period, we are mindful that the time period is a limited one. The parties continued substantive communication into mid-April, but by May 9, 2016, the communication had transitioned to intermittent emails by which Crouch simply was attempting to ascertain whether Lonestar had made any decisions based on the prior

21

substantive discussions between the parties. By June 7, 2016, the communication had devolved into Crouch inquiring whether Lonestar would be choosing to move forward with construction of the railcar repair facility. During the course of the contractual relationship, Lonestar mailed payment for one invoice totaling $16,635.00 to Tennessee.

These circumstances are significant in that an on-going business relationship typically provides more opportunity for substantial forum contact by the defendant than an isolated or one-shot business transaction. See, e.g., CompuServe, Inc. v. Patterson, 89 F.3d 1257, 1265 (6th Cir. 1996); Gateway Press, Inc. v. LeeJay, Inc., 993 F. Supp. 578, 581 (W.D. Ky. 1997); Diamond Grp., Inc., 998 N.E.2d at 1022. In our view, the contractual relationship between Crouch and Lonestar—and Lonestar's contacts with Tennessee related to that relationship—occupy a middle ground. The relationship certainly is not as extensive as a "carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts." Burger King, 471 U.S. at 480. But neither would we characterize the relationship as comparable to an individual consumer remotely arranging for a single purchase of stock merchandise. See Darby, 458 S.W.2d at 426-27 (rejecting personal jurisdiction over a nonresident individual who arranged via mail and telephone for the retail purchase of a modest amount of stock mahogany).

In PTG Logistics, LLC v. Bickel's Snack Foods, Inc., 196 F. Supp. 2d 593 (S.D. Ohio 2002), the nonresident defendant purchased a snack food facility for which the plaintiff had an existing transportation services agreement, whereby the plaintiff transported food products from a manufacturing plant and warehouse to various retailers. Id. at 596. The precise nature of the contractual arrangement between the parties that followed the defendant's purchase on January 1, 2000, was disputed. Id. at 596-97. Both parties, however, continued to perform under the contract—the plaintiff transporting food products and the defendant making bi-weekly payments—until mid-April. Id. at 597. During that time, the parties had substantive communications by mail and telephone, as well as at an in-person meeting in the defendant's forum state, regarding potential modifications to the contractual relationship. The defendant ultimately disavowed the agreement,[14] leading the plaintiff to sue for breach. Id. The district court concluded that the nonresident defendant was subject to jurisdiction in the plaintiff's forum state. Id. at 600-01.

---

[14] Although the defendant disavowed the agreement on April 14, 2000, it continued to make occasional payments to the plaintiff until June 2000. In all, the defendant made sixteen payments totaling in excess of $500,000.00. PTG Logistics, 196 F. Supp. 2d at 597.

Although there are circumstances in PTG Logistics that differ from the case before us, the duration of the relationship between the parties was not significantly different. Nevertheless, we do not view the length of the contractual relationship in this case—and the concomitant extent or quantity of Lonestar's contacts within Tennessee—as weighing heavily one way or the other in our analysis. Instead, we are drawn to focus on the quality of the acts associated with the contractual relationship rather than the duration of the relationship. See Calphalon Corp. v. Rowlette, 228 F.3d 718, 722 (6th Cir. 2000).

The pertinent acts associated with the contractual relationship include Lonestar's choice to contract with Crouch and emailing the executed agreement to Tennessee, Lonestar's communications directed to Crouch in Tennessee during the parties' course of dealing, and Lonestar's mailing of a check to Tennessee in partial payment on the contract. The circumstances surrounding the executed contract and the check speak for themselves. With respect to the communications, as we previously pointed out, the contract expressly contemplated communication and coordination between Crouch and Lonestar during the course of performance. Under the contract, Lonestar had "continuing obligations" that would connect it to work occurring in Tennessee. Lonestar was expected to assist Crouch with information necessary to accomplish the planning and design services, and Lonestar sent such information to Tennessee. Additionally, Lonestar and Crouch continued substantive communication even after Crouch had provided its preliminary report. From our review of the record, we conclude that although Lonestar's communications over the parties' course of dealing were limited in volume, Lonestar did send substantive communications to Tennessee to aid performance under the contract.

We also deem it relevant that the contract was one for custom engineering services as opposed to stock goods. Compare Nicholstone, 621 S.W.2d at 564 (finding jurisdiction in the case of a contract for "custom-made bindings and casings"), with Darby, 458 S.W.2d at 426-27 (finding no jurisdiction in the case of a contract for stock mahogany that required no special manufacturing operations in Tennessee). See also Gateway Press, 993 F. Supp. at 580. Moreover, the significance for purposes of our analysis lies not just in the fact that the contractual services were specialized, custom services that entailed significant development activities in Tennessee. Rather, what is equally important is that the specialized, custom nature of the services prompted substantive communications by Lonestar to Tennessee.

It is significant that Lonestar's communications were, at least on occasion, substantive with respect to performance under the contract. The mere fact that Lonestar sent communications to Tennessee does not automatically render such contacts sufficient to confer jurisdiction. See, e.g., Phillips Exeter Acad. v. Howard Phillips Fund, 196 F.3d

284, 290 (1st Cir. 1999) (stating that it is the "content of the parties' interactions that creates constitutionally significant contacts"). Yet we do not believe that Lonestar can be cast as having merely asked Crouch to produce a report and then passively waited in Texas for Crouch to do so. Lonestar's communications exhibit important contact tied to contractual performance occurring within Tennessee. The contract contemplated such communication from its execution.

We note that there is a longstanding distinction between a nonresident purchaser who takes an active role in its contractual relationship in the forum state and a passive purchaser who does no more than place an order and await product delivery. See, e.g., First Nat'l Bank of Louisville v. J.W. Brewer Tire Co., 680 F.2d 1123, 1126 (6th Cir. 1982) (per curiam) (attaching significance to defendant's adjustment of purchase orders, thereby indicating an "active rather than passive buyer"); Whittaker Corp. v. United Aircraft Corp., 482 F.2d 1079, 1083-85 (1st Cir. 1973) (distinguishing between active purchasers and passive purchasers); L & P Converters, Inc. v. H.M.S. Direct Mail Serv., Inc., 634 F. Supp. 365, 366 (D. Mass. 1986) (finding no personal jurisdiction over a passive purchaser who did nothing but place a phone order); Conn v. Whitmore, 342 P.2d 871, 875 (Utah 1959) (expressing concern about finding personal jurisdiction over nonresident mail order purchaser). Indeed, even the Burger King Court hinted at such a distinction when it expressed concern over the "exercise of jurisdiction over out-of-state consumers to collect payments due on modest personal purchases." Burger King, 471 U.S. at 485 (internal quotation marks omitted).

Although not determinative, we find comparative value in the active-passive purchaser distinction in that it can serve as a short-hand means of expressing how involved a nonresident is in activities within the forum state. In other words, it serves to illuminate when a nonresident defendant is sufficiently active in a business transaction within the forum state that its contacts can be deemed substantial enough to allow for the exercise of personal jurisdiction.

We previously have examined the validity of personal jurisdiction in a similar fashion. In Nicholstone, we addressed the exercise of personal jurisdiction in the context of a single business transaction. 621 S.W.2d 560. The plaintiff was a Tennessee book binder. The plaintiff encountered the New York publishing house defendant at a trade show in Atlanta and began negotiations for the plaintiff to perform and deliver certain custom printing work. It is unclear which party initiated the negotiations, but the plaintiff later sent a representative to New York to discuss the job with the defendant. The plaintiff placed bids for the printing work, and the defendant thereafter sent a purchase order to the

24

plaintiff's office in Tennessee. Further negotiations by phone and mail ensued, and the plaintiff ultimately accepted the purchase order. Id. at 561.

The plaintiff performed the custom printing and binding work primarily in Tennessee, utilizing various suppliers and subcontractors. Part of the work included "specified cover stock from a Kingsport[, Tennessee] firm." Id. at 561. During the course of the work to complete performance under the contract, the defendant contacted the Kingsport firm and altered the cover stock. Approximately six months after the Atlanta meeting, the plaintiff shipped the custom merchandise to New York. When the defendant failed to pay as required, the plaintiff brought suit in Tennessee. Id. at 561-62.

We determined that the exercise of personal jurisdiction over the defendant was constitutionally permissible. Id. at 566. We noted that which party initiated the business transaction was not a decisive factor. Id. at 563. Although the plaintiff sent a representative to the defendant in New York and placed bids for the printing work, we found it significant that the defendant ultimately chose to do business with the plaintiff and sent a purchase order to the plaintiff in Tennessee. Id. The contract called for a customized product. We also pointed out that the defendant dealt directly with one of the plaintiff's subcontractors, the Kingsport firm, on an issue substantively related to performance under the contract. Considering the totality of circumstances, we concluded "it is difficult to conceive of defendant not having foreseen the possibility of its being haled into a Tennessee court upon refusal to pay for the manufactured products." Id. at 564.

Lonestar argues that the basis for our reasoning in Nicholstone has been eroded by subsequent caselaw, particularly Burger King and Walden. More specifically, Lonestar contends that Nicholstone incorrectly focuses the personal jurisdiction inquiry on foreseeability, but foreseeability alone is not a sufficient basis for exercising jurisdiction. Lonestar also contends that a defendant's knowledge of a plaintiff's forum connections cannot form a basis for the exercise of personal jurisdiction over the defendant. Relatedly, Lonestar contends that contrary to the factual scenario in Nicholstone, a plaintiff cannot be the only link between a defendant and a forum.

As to Lonestar's contention that Nicholstone incorrectly focuses the personal jurisdiction inquiry on foreseeability alone, we do not share Lonestar's view of our analysis in Nicholstone. In Nicholstone, we explicitly recognized that foreseeability alone has never been a sufficient benchmark for personal jurisdiction. Nicholstone, 621 S.W.2d at 564. We expressly acknowledged that the foreseeability that is critical to due process analysis is instead that the defendant's conduct and connection with the forum state are such that it should reasonably anticipate being haled into court there. Id. (citing World-

25

Wide Volkswagen, 444 U.S. at 297). "In applying the World-Wide test of foreseeability," we turned to an examination of the defendant's conduct and connection with Tennessee, taking note of the defendant's choice to enter into a contract which called for production of a customized product in Tennessee and the defendant's action in dealing directly with a Tennessee subcontractor on a substantive issue related to performance of the contract. Id. We placed these circumstances in appropriate context—that the defendant's conduct and connection with Tennessee were such that it should have reasonably foreseen being haled into court in Tennessee. Id. The foreseeability portion of our Nicholstone analysis flows directly from World-Wide Volkswagen, and we find nothing in Burger King or Walden that indicates the lessons of World-Wide Volkswagen in this regard are suspect or have been altered to the point that it would require a different result.[15]

As to Lonestar's contention that a defendant's knowledge of a plaintiff's forum connections cannot form a basis for the exercise of personal jurisdiction, we do not view anything in Nicholstone as inconsistent with more contemporary precedent from the United States Supreme Court. We observe that a defendant's knowledge of a plaintiff's forum connections, in fact, can be a relevant consideration. "The plaintiff's residence is not, of course, completely irrelevant to the jurisdictional inquiry. . . . That is, plaintiff's residence in the forum may, because of defendant's relationship with the plaintiff, enhance defendant's contacts with the forum." Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 780 (1984). In our view, Nicholstone is not inconsistent with this approach. We also observe that the Burger King Court, when analyzing the exercise of personal jurisdiction over the defendant, clearly considered relevant the defendant's knowledge of the plaintiff's forum connections. Burger King, 471 U.S. at 480 (stating that the defendant "most certainly knew that he was affiliating himself with an enterprise based primarily in" the forum state).

Finally, as to Lonestar's contention that a plaintiff cannot be the only link between a defendant and a forum, we do not interpret Nicholstone to recognize that a defendant's relationship with the plaintiff alone can form a sufficient basis for exercising personal jurisdiction. In Nicholstone, as referenced above, we looked to the defendant's conduct and connection with Tennessee, even though they might have arisen by virtue of the defendant's contractual relationship with the Tennessee plaintiff. We do not believe this reasoning is inconsistent with more contemporary precedent from the United States Supreme Court.

---

[15] In fact, Burger King specifically cites these principles with approval. Burger King, 471 U.S. at 474 (citing World-Wide Volkswagen, 444 U.S. at 295).

As Lonestar points out, the <u>Walden</u> Court stated that minimum contacts analysis looks to the defendant's contacts with the forum state rather than its contacts with persons who reside there. <u>Walden</u>, 571 U.S. at 285. Yet the Court also recognized that "a defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff," and, thus, the Court's concern arises only when the defendant's relationship with the plaintiff or a third party—standing alone—is the basis for jurisdiction. <u>Id.</u> at 286. Not surprisingly, then, the Court cited as an example of proper jurisdiction the contractual arrangement in <u>Burger King</u>. <u>Id.</u> at 285. In <u>Burger King</u>, it was not the relationship between the parties standing alone—in other words, the mere existence of the contract—that was sufficient to establish minimum contacts. Rather, it was the defendant's contacts within the forum state arising from and in furtherance of the contractual relationship with the plaintiff that were substantial enough to confer personal jurisdiction. We find nothing inconsistent in the analysis in <u>Nicholstone</u>.

In summary, based upon our evaluation of the quality of Lonestar's contacts with Tennessee, we conclude that, considering all of the facts and surrounding circumstances, Lonestar's contacts were substantial enough to allow for the exercise of personal jurisdiction. Lonestar voluntarily elected to contract with a Tennessee company with expertise in railway engineering. The contract called for custom planning and design services that entailed work of some complexity. Lonestar knew that it was affiliating itself with a company that had its office in Tennessee and that contractual work would occur primarily in Tennessee. Lonestar is a corporate entity that was contracting with another corporate entity for commercial services, and it was obviously free to decline to pursue this business opportunity in Tennessee.[16]

Performance under the contract was expected to be relatively short-term, projected to take only approximately five to six weeks. The parties' course of dealing ultimately lasted approximately three months.[17] The contract expressly contemplated continuing obligations on the part of Lonestar with respect to work under the contract. <u>See</u> <u>Burger King</u>, 471 U.S. at 473, 476. By the terms of the contract and the parties' course of dealing, Lonestar was obligated to communicate with Crouch and supply information to help accomplish performance in Tennessee. In other words, Lonestar had a role to play as the contractual services unfolded in Tennessee. Lonestar did so, not by physically visiting Tennessee, but through communications—albeit limited ones—sent to Crouch in

---

[16] Moreover, a company may also choose to include a forum selection clause in any contract.

[17] There was continued communication after that time period, but it served mainly to show that the substantive relationship between the parties had effectively ended.

Tennessee. Lonestar's communications helped accomplish the work that was reflected in Crouch's preliminary report, identified as a deliverable under the contract. The communications also included exchanging information related to Lonestar's subsequent reaching out to Crouch about potential modifications to what was reflected in the preliminary report.

In choosing to contract with Crouch and to accomplish performance under the contract, Lonestar reached into Tennessee and established forum connections. We recognize that Lonestar's contacts with Tennessee—courtesy of its purposeful choice to contract with a Tennessee company, knowing that performance under the contract would entail activities in Tennessee and joining in accomplishing that performance—do not exhibit as "substantial and continuing" a relationship as the one envisioned by the parties in Burger King. Nevertheless, we conclude that the quality of Lonestar's contacts is substantial enough that Lonestar should reasonably have anticipated being haled into Tennessee to answer for an alleged breach of its contract. Lonestar's contacts in this case may indeed be characterized as "minimum," but minimum is all they need be to pass constitutional muster.

We acknowledge that this case presents a close question and there is precedent that might tend to weigh against finding the existence of minimum contacts. See, e.g., Lakeside Bridge, 597 F.2d 596. Counsel for Lonestar has ably pointed to caselaw supportive of its position—as has counsel for Crouch—and we commend them for their briefing and argument. If one thing is reasonably clear, it is this: More than three decades after Justice White dissented from the denial of certiorari in Lakeside Bridge and Nicholstone, and even after the United States Supreme Court issued in Burger King its most recent opinion addressing the question of personal jurisdiction based on contractual dealings, the greys remain dominant, and even among them, the shades remain innumerable. See Kulko, 436 U.S. at 92.

### E. Whether Jurisdiction Would Be Unreasonable or Unfair

Having determined that Crouch set forth a prima facie showing of sufficient minimum contacts between Lonestar and Tennessee, we turn to the second step in the jurisdictional analysis. We now must determine whether, in spite of the existence of minimum contacts, exercising jurisdiction over Lonestar in this particular case would be unreasonable or unfair. See First Cmty. Bank, 489 S.W.3d at 388-89. In determining whether exercising jurisdiction over Lonestar would be unreasonable or unfair, we consider: (1) the burden on the defendant; (2) the interests of the forum state; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in

obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies. Sumatra, 403 S.W.3d at 752 (citing Davis Kidd Booksellers, 832 S.W.2d at 575); Gordon, 300 S.W.3d at 647 (citing Asahi, 480 U.S. at 113).

Lonestar bears the burden as to the second step of the jurisdictional inquiry. In its arguments, Lonestar has not focused its efforts on carrying its burden as to the second step. From its memorandum supporting its motion to dismiss in the trial court through to its brief in this Court, Lonestar has argued simply that this case does not make it past the first step. Nevertheless, because the trial court found that exercising personal jurisdiction over Lonestar would be unreasonable and unfair, we briefly will address the relevant considerations.

The trial court intimated that "a majority of the witnesses and evidence of the work performed are in Texas, and it would be a burden and expensive to force Lonestar to litigate this dispute in Tennessee." We do not believe the record demonstrates that a majority of the witnesses and evidence of the work performed are in Texas. The record is largely silent in this regard. As for the burden and expense for Lonestar to litigate this dispute in Tennessee, the same advancements in transportation and communications that have transformed modern business transactions—and personal jurisdiction analysis—tend to lessen any unfair burden associated with a defendant having to litigate a dispute in another state. See Burger King, 471 U.S. at 474. We can glean no special or unusual burden from the limited record before us. We also do not believe that the mere fact that Lonestar would have to travel from Texas to Tennessee amounts to a constitutionally significant burden. See Aristech Chem. Int'l Ltd. v. Acrylic Fabricators Ltd., 138 F.3d 624, 628 (6th Cir. 1998) (stating that the travel distance between Kentucky and Ontario, Canada did not make the exercise of jurisdiction unreasonable); PTG Logistics, 196 F. Supp. 2d at 601 (stating that the distance between Pennsylvania and Ohio was not so great as to make travel prohibitive for the defendant).

As for the second and third considerations, we do not doubt that Crouch has a substantial interest in obtaining relief in Tennessee, and Tennessee has a corresponding manifest interest in providing residents with a convenient forum for redressing injuries inflicted by out-of-state actors. See Burger King, 471 U.S. at 473; Nicholstone, 621 S.W.2d at 564 ("Tennessee clearly has an interest in protecting its residents against a breach of contract by nonresidents . . . ."). The trial court's findings are in accord on this point.

As for the fourth and fifth considerations—the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several states in furthering fundamental substantive social policies—we find nothing in the limited record before us that weighs heavily in one direction or the other.

From the limited record before us, Crouch's interest in having a convenient forum to redress the alleged breach of contract and Tennessee's interest in providing one are certainly no less substantial than the burden on Lonestar associated with litigating this action in Tennessee. We therefore conclude that Lonestar has not carried the burden of establishing that the exercise of personal jurisdiction in this particular case would be unreasonable or unfair.

## III.   CONCLUSION

Considering the facts and surrounding circumstances in their entirety, we conclude that Crouch presented prima facie evidence of Lonestar's "minimum contacts" with Tennessee. We further conclude that Lonestar did not establish that the exercise of personal jurisdiction over it would nevertheless be unreasonable or unfair. Accordingly, we hold that the exercise of specific personal jurisdiction over Lonestar in Tennessee in this case does not offend traditional notions of fair play and substantial justice and is, therefore, constitutionally permissible. We affirm the judgment of the Court of Appeals and remand this case to the trial court for further proceedings.

_____
JEFFREY S. BIVINS, CHIEF JUSTICE